Good morning. Let's call the matter of Daniels v. Woodford. Good morning. May it please the court to warn Robinson, Deputy Attorney General, for responding to this case. All right. Dr. Absolut is on behalf of the petitioner, Judge Daniels. He and his son, Phyllis, were in combat. Is that light probably shining on your? It's okay, because you could always close. Yeah. All right. You may proceed. Thank you very much. It is respondent's position in this matter that petitioner received effective assistance of counsel from Carl Jordan at both phases of this trial. Petitioner wanted to be represented by Andrew Roth, who, in fact, did represent him for a period of time and did assist the public defender during a period of time before he was appointed. Counsel, let me say something that bothers me right off. I'm a lawyer from the state of Washington, and we never allow, in a death penalty case, someone who's not had prior experience in death penalty representation to be lead counsel. This kind of shocks me, in this case, that that happened. Well, there's a first time. There has to be a first murder case. Sure, but then you're in a second seat. You're not first seat, you see. Here, neither of these guys had had prior death penalty experience. Isn't that correct? That is correct, but certainly Mr. Jordan had a lot of experience as a deputy district attorney. He had homicide experience. He tried one homicide case. Yes, but that, per se, does not make someone ineffective. We have to look at the record and see what he did. Anyway, I just want you to know my special concern here. Well, I think when we go through the facts and see what happened, the Court's concerns on that point will be alleviated. Now, in this matter, Mr. Daniels did not communicate with Mr. Jordan. He did not talk about the offense. Now, the district court blames Jordan for that failure to communicate, but the record shows that Jordan continuously asked Petitioner to talk about the case, but Petitioner just wouldn't do so. It should be noted that Petitioner was represented by Roth. Roth was asked by Jordan for any help. There's no indication that Petitioner spoke to Roth about what happened. There's no indication in the record at all that Petitioner, who has been represented by present counsel for years, has spoken to them about the facts of the case. As a matter of practice, sometimes attorneys are faced with clients who don't provide helpful information. Sometimes as an attorney, you speak to your client, and your client will simply tell you, yes, I did it, and the attorney has to do the best job that he can. Or sometimes the client might tell a story that's so outrageous that you know you're not going to present that story as a defense attorney. It's pretty rare when the attorney talks to the client and says, yes, I did it. In fact, I think you do everything you can to keep them from saying that. Well, I would differ with that. I think there are a number of times when a defense attorney will speak with a client, and the client will tell him that he is guilty of the crime, and the attorney will do the best he can. The case will often proceed to trial without the testimony of the defendant, which happens frequently. But I don't think that is rare when a client confesses to his attorney or has nothing helpful to say about the case. We had cited to us just in the last week this Naguilian case that I think Judge Ferguson wrote, which had a similar situation where the Vietnamese individual didn't have confidence in his public defender, so he wouldn't talk to him, and he wanted a different lawyer. And in that case, it was felt that they had to make some effort to get him a lawyer who could and would communicate with him. Here, we have a lawyer that apparently the defendant would have communicated with. Well, first of all, the Nguyen case is distinguishable from this case. In that case, the defendant made a motion that was either a motion to substitute counsel or a motion for continuance, and that motion was denied, and that matter was remanded to the trial court for further hearings. Here in this case, we have a full record of what occurred. And the record shows that Mr. Roth did represent Petitioner for a period of time, but there's no indication at all that Petitioner confided in Roth. Certainly, if he had done so, Roth would have forwarded that information to Jordan, but he did not. At the hearing in the district court, Petitioner could have made some proper of evidence as to what he could have told his attorney, but he did not do so. So, basically, what we have in this case is where the district court invents what Petitioner would have told an attorney if Petitioner would have, in quotes, cooperated. And according to the district court, it is obvious, and that is his term, what Petitioner would have said. And according to the district court, Petitioner would have told his attorney that he simply, he drew out a gun to try to make the officers stop and desist their efforts to arrest him so he could then leave the house. Of course, Renee Roth, who was basically there in a closet during this whole incident, didn't hear any such demand on the part of Petitioner. After the shooting, what did Petitioner tell her? He told her, I had to get even with what they did for me before, obviously referring to the prior shootout where he was rendered a paraplegic. He also told Ted Smith simply that I saw my opportunity and I took it. He didn't tell Ted Smith, well, I wanted to get out of the house so I drew my gun and then the officers drew their gun and then, to my surprise, I ended up in a shootout. Sometimes, as in a case like this, a defendant is simply in a position where he just doesn't have much of a defense. That's what happens when there's you, a witness, two officers, and you draw a gun and the officers end up dead. Petitioner simply didn't have a good defense in this case. Now, a defense was put on. Mr. Jordan tried to show, well, it was James Cornish's house and James Cornish had apparently left his place of employment about the time of the shooting. And he adduces evidence that another person may have gone to that house for whatever reason. And what's interesting, there's no indication that Petitioner objected to that defense. The district court says, well, the sole focus should have been on preventing a verdict of death in this case. But Petitioner may not have been so willing to simply say, okay, let me go to prison for the rest of my life. There is no indication at all that Petitioner objected to the defense. There have been other cases in which there have been conflicts between attorneys and defendants that have resulted in reversals. But I don't think there's ever been a case where the only conflict is simply a lack of trust. There was no dispute about what type of trial tactics to use. There was no dispute about what defense to offer, what witnesses to call. The only conflict was the distrust that Petitioner had for Mr. Jordan. That is it. He didn't object to any of the witnesses who were called. He didn't want any other witnesses called, both at the guilt phase and the penalty phase. So in this matter, Jordan, faced with a client who wouldn't communicate with him, did the best he could. He presented a defense in the guilt phase. He was in a very tough situation, and he did the best he could. He provided some scenario whereby a jury could find, well, maybe someone went into the house and committed the murders. In the penalty phase, he produced numerous witnesses who testified that Jackson Daniels was basically a good man despite his past record. He did not really bear any hard feelings towards the police. He would not present a danger to a Department of Corrections personnel if he were incarcerated. So a defense was presented both at the guilt phase and both at the penalty phase. I don't know what more Mr. Jordan could have done. There's just nothing in the evidence showing that there was more substance that he could have presented or that Petitioner had this account of what happened that would have helped the defense. Simply nothing. Well, you had this sort of unfortunate situation where a public defender was on the case, and it took them, what, months, maybe seven, eight months, and they decided they had to get off. And then there were a series of appointments of new counsel, and then the court would appoint someone else. So you kind of had a revolving door of lawyers in there for a while there. But that's very common that a public defender will be appointed, the public defender will be relieved. Then Attorney A will be appointed. Well, I'm not saying that that's uncommon. But you get seven months, and then you get a series of lawyers that are appointed and then pulled out of the case. And then he ends up with a former prosecutor who's never tried a death penalty case for a defendant. Well, that's all true. But often defendants go through numerous attorneys. Often prosecutors become defense attorneys. There's got to be a first capital case for everyone. And even if there isn't, we have to look at the record and see, did Jordan or did he not provide effective assistance of counsel? When we get to the penalty phase, Jordan asked for more time. He said he'd been concentrating on the guilt phase. The judge wouldn't give him more time to investigate. And I think there was substantial evidence about the mental state and the past mental problems of Daniels that should have been brought to the court's attention. Isn't that concerning? Well, I would disagree with the court that there was substantial evidence of any mental problems. First of all, we had Dr. Phillips, a psychiatrist who counseled Petitioner after he was rendered a paraplegic. You saw him numerous times. He didn't think anything was mentally wrong with him. And then Mr. Jordan, who did have a lot of background in mental defenses, knew Dr. Oliver from his past experience as a prosecutor. And he had Dr. Oliver render a report. Dr. Oliver didn't find anything wrong. So we have a situation where two different psychiatrists have examined your client. Mr. Jordan is entitled to rely on their expertise. Well, they didn't really examine the client in the sense of giving him tests or looking into his past history. Isn't that correct? No, I think they had access to his past history. I'm not sure if any tests were administered or not. But the point is that Mr. Jordan was entitled to rely on the opinions of these psychiatrists. Wasn't Oliver brought in for just a limited purpose? Whether he was brought in for a limited purpose? Was he? I don't believe he was, but I'm quite certain of this, that he, in his report, said, I don't see any basis for any mental defense in this trial at all. That's all we have is his one letter that says that, isn't it? It's just a one-page report. It wasn't even a report. It was just a letter. Dr. Oliver believed he had a sufficient basis to render that opinion. Jordan was entitled to rely on Oliver's expertise. But let's go even beyond that. Let's go to what happened post-trial. And, of course, there was the presentation of the testimony of Dr. Banks and the testimony in rebuttal of Dr. Bieber. But then, even after trial, we have Dr. Rosenthal, who first examines Petitioner and says there's a possibility of brain damage. Then he writes another report saying there's a probability of brain damage. Then we have another report in which he says, yes, Daniel has brain damage. Nothing happened in the intervening time between the possibility of Petitioner having brain damage and the certainty that he had brain damage. Dr. Stahlberg, appointed by the district court, found no evidence of brain damage. Dr. Dudley, who wrote the humongous report after he was retained by present counsel, found no evidence of brain damage. Dr. Dudley really doesn't find too much wrong. He does say at one point that Petitioner had a paranoid condition so he couldn't cooperate with counsel. And then, in his conclusion, he says, well, I don't think everything was done in this case to present mental defenses that may have been available. But over all this time, even though they have criticized Dr. Oliver and Dr. Phillips and Dr. Banks, Petitioner's counsel have come up with nothing solid to show there was anything wrong with Daniel's. Jordan testified he did not think there was anything mentally wrong with Daniel's. Often defendants don't trust their attorneys, especially when the case is very bad. Sometimes they will try to insert problems into the system, for lack of a better term. But after all these years, there is nothing solid to show that Petitioner had any mental problems. If there were to be a retrial, the evidence would not be as strong as Banks' testimony that maybe he has brain damage. Because at this point, the prosecutor has the testimony of Stahlberg and has the testimony of Dudley, that there is no indication of brain damage. So, I know that the court requested, this is one of the issues that the court wanted briefing on, but there simply is no solid evidence that Petitioner had brain damage. The best they have is the report of Dr. Rosenthal, which is contradicted by his earlier report that it was just a possibility. Counsel, in regard to the incompetent counsel at the penalty phase, Jordan was appointed four months before the trial, and the other counsel was appointed two months before the trial. Do you think that competent attorneys are qualified and have the time and ability to present a penalty phase in a death penalty case in that short period of time, particularly when the trial court refuses additional funds to hire expert witnesses? Yes, I do. Do you think there's a violation of due process because of that? Not at all. I think we have to consider not only the time. Have you ever seen a death penalty case, we're talking about now, I'm not talking about the guilt phase, I'm talking about the penalty phase, where a lawyer has to prepare himself in four months? I believe that. You simply can't do it. Have you ever had any expert witness ever tell you that that's possible? From my personal experience, I remember when I was a deputy district attorney in Fresno, it was a death penalty case, the defendant didn't wait time, he had prelim within the 10 court days, he had his trial within the 60 days after arraignment. I don't think we can look at the matter of time. Involving the penalty of death? Yes, that's my recollection. And he won the case? I don't know if he won the case, but it doesn't mean he was ineffective. I think what we have to look at, first of all, is not just the time before trial, but the time during trial. I'm not talking about ineffectiveness. I'm talking about the court violating due process rights in giving an attorney who was reasonably confident the time and the money to present a defense why the defendant should not be executed by the state. I mean, that's a simple, ordinary thing. We don't have to delve very far into it. It has nothing to do with incompetency of counsel. The time was sufficient, and we know that by looking at the record. There were all these witnesses who were presented in the penalty phase. There was Dr. Banks' testimony that was presented in the penalty phase. We just look at the record. We see that Jordan had enough time to get it, and Smiley had enough time to get it. Originally, the trial was set for 11 months after the arraignment. And the reason it was set 11 months after the arraignment is because the judge and everybody knew that a reasonable, confident attorney was going to have to take that long in order to properly defend this case. Yet, lo and behold, in actuality, he only had four months. I would certainly disagree that four months is insufficient as a matter of law for counsel to prepare for a capital case. What was the reason for denying the funds to hire psychiatrists? Well, first of all, funds were granted. Dr. Oliver was retained. He's a qualified psychiatrist. Dr. Banks was retained. He's a qualified psychologist. There were funds that were forwarded. But I think the important thing is to look at what the lawyer knew he needed more money. And he asked the judge, he said, judge, I need more money. And the judge said, no, I'm not going to give it to you. And then he changed his mind later on and gave it to him when it was too late. I think lawyers on defense are always asking for more time and more money. I don't think that means that Jordan rendered ineffective assistance of counsel. Let's look at all that has transpired after the trial. What has Petitioner come up with over these 20 years? Nothing of substance. And that's been 20 years. And when we look at that, we can then say that even though the time to prepare was not ideal, it was sufficient because afterwards the defense has come up with nothing of significance. Well, he didn't have the money to hire a lawyer, so he's paralyzed and he's in prison. And he's certainly got to be depressed by that whole situation. And he accepts it for a while. Time goes on. Things change. Just because someone has been in there for a long period of time and done nothing. We read about defendants quite often that have done 15, 20 years in prison. And lo and behold, they're released because of the evidence in the case of DNA, whatever. So a lot of those people, you read about it, and they're in prison and they just accept it. And they don't know what else to do. Well, I agree there are cases. He didn't have a battery of lawyers out there for 20 years, did he? Well, he's had present counsel for many years, and they have had experts examine him. And when we look at, when we decide whether there's ineffective assistance of counsel, we have to look at where there was prejudice. If there are DNA results showing a defendant is guilty, then yes, he should be released from prison. But in this case, even after all the defense investigation, there is nothing of substance that has been uncovered that Jordan should have presented. See, the most unusual thing, one of the most unusual things about this case, is the attitude of the Board of Supervisors in Riverside County when they had an investigation of the public defender because he was recusing himself because of conflicts of interest too many times and was costing the county too much money to hire independent counsel. Now, what kind of nonsense is that in the criminal justice system? It's probably, it's nonsense that's irrelevant to this case because the public defender did not... Irrelevant to this case because the public defender for nine months tried to get out of it. But the public defender did get out of it. He got out nine months later without doing any work. And then his present counsel had four months. And the only reason why there was this delay of nine months is because the Board of Supervisors said we're not going to permit you to recuse yourself for conflicts of interest because this costs the county too much money. Okay, be that as it may, there was this delay because the public defender did not declare a conflict. But the fact remains, private public defender was relieved. Mr. Roth was appointed for a period of time until it was pointed out to the court that he would be a witness for the prosecution, which he was. Then Mr. Jordan was appointed. He wasn't a witness, as it turned out. Isn't that right? It's my recollection that he did testify. He testified that petitioner had been told that he had to surrender himself in court on a certain date and did not do so. That's my recollection. Well, that was what they said they were going to have him testify to. But as I read this, I could be wrong, but I read a pretty voluminous record here. I don't think he did testify. Well, I could be wrong about that. But my recollection is, in any event, he was going to be called. He was going to be called, but he didn't need to be called. They had a lot of other ways of proving that. Well, again, the fact remains that even with the problems with the public defender and with Roth's appointment and then removal, competent private counsel was appointed. He had, let's say, four months before the entire trial was to begin. And, of course, after the trial begun, he was not constrained from preparing the case further. He made a motion for a continuance. Yes. How do you know he was not constrained? But he made a legitimate motion for a continuance of the penalty phase. Because I see the defense that he put on and I see what has happened in the intervening years where nothing of substance has been found by petitioner. That makes me say he was competent. At least he made the motion. Because he knew he could not prepare in that short a period of time on the penalty phase. Well, I would submit... Do you agree with that or not? No, I don't. Do you think his motion was frivolous? He wanted more time. Defense attorneys almost always want more time. Well, defense attorneys. No, I'm just saying that... Continuance. No, it's common that defense attorneys ask for continuance and just because a court doesn't grant it doesn't mean that the motion shouldn't be granted. And I understand the court's concern that there was this problem with counsel. Mr. Jordan didn't have the ideal amount of time that he should have. But what we have to do is look at prejudice. We've had 20 years since the conviction. Not only time, but money. Pardon me? The money part. Again, with the money part, let's assume that... Now, Jordan did not get all the money he wanted. But where is the prejudice? I think what we have to do after trial is look and see where the prejudice is. Was there a witness who should have been called? Was there DNA evidence that was exculpatory? Was there fingerprint evidence that was exculpatory? That does not require prejudice. Incompetent constantly requires prejudice, but the Due Process Clause does not require prejudice. It requires a fair trial, and that's what Petitioner had in both phases of his trial. And I think it's very important that we not just focus on what happened before the trial and say, well, this wasn't ideal. Jordan should have had more funds. He should have had more time. But let's see what happened afterwards. What has Petitioner come up with? Nothing. There's no exculpatory fingerprint evidence or eyewitnesses or psychological testimony. There's basically nothing he's come up with. You want to save your time and let's hear from Petitioner. Thank you. Good morning, Your Honors. Once again, I'm John Katsouroulis. I'm one of Petitioner's counsel. What we would ask to do is I'm going to address the issues as they relate to the penalty phase of Mr. Daniel's Petitioner's case, and I'd ask that my able co-counsel, Mr. Phillips, want to address the guilt phase across the teal issues that are before the Court. I would point out initially that the District Court had a number of years with this case, personally saw trial counsel testify, had a number of years to absorb the voluminous information before this Court and the declarations, and disagreed with the Attorney General's analysis as it relates to the penalty phase. I think a good place to start with the penalty phase analysis is with the California Supreme Court's opinion, wherein it found error in this penalty phase, error that we would view to be serious. It found that the weighing process that the jury was instructed about was erroneous, that this jury was told that a mechanical weighing was appropriate in this case, that you shall vote death if aggravation outweighs mitigation. That's an incorrect instruction of law. And the California Supreme Court found that the District Attorney, with court approval, was allowed to argue that all absence of mitigation is aggravating evidence, which is incorrect. The California Supreme Court, however, stated, because of the minimal or de minimis mitigation that was presented, it found these errors to be harmless. So I think it was with great interest that we noted, and the District Court noted, that trial counsel came forward in his testimony, and repeatedly in his declarations, and stated he felt a different outcome of this case was possible, that he felt there was powerful mitigation evidence that he was deprived because petitioner was not, in his words, speaking with him, was not willing to confide in him. What I think the District Court learned was that if trial counsel had followed simply the basic preparation and been given the funds and the time to perform the basic preparation that's required of capital counsel under Wiggins v. Smith, as it's now defined, and under the ABA guidelines, that mitigation he was seeking would have been disclosed to him. What Mr. Jordan told us during the District Court hearing was that he felt the mitigation in this case was intertwined with Mr. Daniel's status as a paraplegic, as a cripple, that he felt if he could disclose the event that led up to his cripple, his paraplegia, and if he could have Mr. Daniels discuss the pain he felt as a paraplegic and the type of life he lived and endured on a daily basis, a life that few people would want to endure, that the mitigation story in this case would come forth to the jury. How does a trial judge determine whether or not a lawyer is incompetent? A trial judge? Is it a matter of fact or is it a matter of law? What process goes through a judge's mind to determine that a lawyer is incompetent? Well, I think what the District Court saw was the massive amount of information that was not disclosed. So would you have to have an expert testify that the lawyer was incompetent or can the judge just decide by himself that the lawyer was incompetent? How do you make that very crucial, very crucial finding of fact? Well, in this case, I believe Judge Less wanted to make that finding of fact himself based on evaluating the record. However, we did submit... Well, does the judge know what a reasonable lawyer would do? You're assuming that all judges know what reasonable lawyers will do. Well, we disagree with Judge Less, and we felt he should have expert testimony on that point, and we did submit two declarations to the Court, Jack Early and Michael Burt, both capital litigators, who Mr. Early had to have practice in Riverside during this time period, indicating that they felt the preparation in this case fell far below the standard of care, as they knew it in the community at that time and as they understand it pursuant to the ABA guidelines in the case law. So I think even though Judge Less did not necessarily want the expert viewpoint, we provided it to him by way of declarations that are before this Court also. Did you bring a due process clause violation except for the prejudice? Did your petition contain a due process argument except for the part pertaining to prejudice, I mean publicity? Well, I believe we argued due process was deprived due to the cumulative error in the case. In your petition, did you allege a due process violation except for that part? I believe we did, Your Honor. You believe you did? Yes. What was your due process argument? Well, I believe we argued that he was denied due process of the law due to the irreconcilable conflict between himself and counsel due to deprivation of power. See, that's not a due process, that's a Sixth Amendment argument. Well, I think we also argued... You didn't argue the short time and the lack of money. You didn't argue what the Board of Supervisors did. My memory is that we did, but... Maybe that's incompetent counsel for not doing that. Well, if it is, I'd ask the court... See how difficult it is? I agree, Your Honor. I think it's incompetent that you didn't do it. I thought we did, but I submit that to the court, but the court will judge that of us, and I'd encourage the court to make that finding if that's appropriate in this case, but... You wouldn't mind that finding, would you? Not at all, Your Honor, no. That's part of my responsibility to be forthright with the court about my failing. I would point out, however, that I think the mitigation that did exist in this case, and I strongly disagree with the Attorney General on this point, was massive, and that the omissions that the district court learned about by way of preparation were massive. I think what the district court learned was that the very essence of where trial counsel thought the mitigation existed in this case, and that Mr. Daniels was rendered a paraplegic in 1980, he had not obtained the records of that act. He had not obtained the Riverside Community Hospital records that reflected that Mr. Daniels had been unconscious and in shock for a period of time, and I think that's important for two reasons. First, it shows the lack of preparation. Second, it shows that this was information that was important in light of Dr. Banks' later screening test that there was an indication of brain damage, the fact that he'd been unconscious and in shock. Dr. Rosenthal mentions that, and Dr. Dudley, contrary to counsel's argument, does indicate that he feels there's indications of brain damage. After Mr. Daniels was rendered a paraplegic, he was put into custody, and in custody he developed an abiding belief that he could not survive, and when Mr. Roth first encountered Mr. Daniels, and none of this information was in trial counsel's file or in his knowledge, when he first encountered Mr. Daniels, Mr. Roth, in custody, he found a man who was in a suicidal state of mind. He encountered him on a gurney in the courthouse, stinking of urine. He went to visit him because he was so concerned about his mental state, and Mr. Daniels essentially told him, I'm suicidal, I can't endure this condition, and it was then that Roth obtained his release on bond, which is why Mr. Daniels had such an abiding faith in Mr. Roth. He felt he had saved his life, along with his long relationship with him. While he's out on bond, and again, none of these records are in trial counsel's files or knowledge, Mr. Daniels then erroneously arrested in August of 1981 by the police, and he creates an 11-page narrative that he provides to Mr. Roth about what happened to him because Mr. Roth brings a subsequent civil suit based on this incident. In that narrative, he describes that he is beaten, he is kicked, he is dragged to the Riverside County Jail, he is left in a condition where he's not treated medically as a paraplegic, he's left without his catheter for an extended period of time, he's subsequently taken to the Riverside Community Hospital again where he is suffering from urine poisoning, a condition he believes at that point is life-threatening, and none of these records are obtained by trial counsel, including none of the jail records, the booking photo, the records from the Riverside Community Hospital. There are witnesses to this event, a Graziano Moreno and a Joey Olson. None of these people are contacted, and trial counsel had no knowledge of this incident. Subsequent to that, Mr. Roth files a civil suit, a $250,000 civil claim against the county and city of Riverside, seeking damages for the assault and battery and the medical mistreatment. Trial counsel had no knowledge, no records of this civil suit. Subsequent to that, Mr. Roth files a writ of habeas corpus with the district court, asking that Mr. Daniels remain out of custody when his bank robbery appeal is denied. And attached to that are declarations from doctors indicating that if he's incarcerated, it will be an endangerment to his health, that he fears for his life, and that additionally he's now walking outside of a wheelchair with the use of braces and a cane and that any further treatment is necessary if he's ever to get out of a wheelchair. None of this is within trial counsel's knowledge, nor does he have those records. Finally, there is substantial evidence, according to the people close to Mr. Daniels, that he had a paranoid conspiratorial sense as to why he had been focused on by the Riverside police when he was paralyzed. He had a totally unbased belief that this was connected to a shooting years before involving another person. He had a conspiratorial sense as to why trial counsel had been appointed in this case to obtain a death verdict against him, and none of this information is fully within trial counsel's knowledge due to his lack of preparation. In essence, I think the district court was left with a record and testimony that showed there had been a massive lack of preparation due to time, lack of funding, and simple lack of taking the basic steps that you do to uncover someone's life. The issue for the district court was why had all this mitigation been lost and were not within trial counsel's knowledge, and the district court ruled that there had been a complete collapse of the attorney-client relationship here, and the district court's words were a more clear breakdown than you could find in any of the Ninth Circuit case law. And I would point out that the attorney general, and I think this was very clear from the record, is simply wrong that Mr. Daniels was not willing to try and talk to counsel. This court has, uniquely before it, letters that Mr. Daniels was writing concurrently with his relationship with Mr. Jordan. He was writing to Mr. Roth. Mr. Roth, contrary to counsel's characterization, introduced Mr. Jordan to Mr. Daniels, attempting to assist the relationship. When he's later approached and asked, will you step in for the penalty phase because he won't talk to us, Roth says, I'll do that. He was always there to assist trial counsel when he was approached. Daniels is writing to Roth during the time after he meets Jordan that he's visited with him several times and he's getting an uneasy feeling, in his words, about this man. A month later he writes and says, I feel that he's deceiving me. He refers to him or co-counsel Mr. Small as the Irish deceiver. By June of that year, 1982, Mr. Daniels is telling the one expert that Mr. Jordan sent in to talk to Mr. Daniels, Dr. Oliver, that he believes his conversations are being monitored and he refused to impart information that's necessary for Dr. Oliver to form an opinion. And Dr. Oliver reports to Mr. Jordan, I think this man is suffering from paranoid ideation. He wouldn't talk to me. Mr. Jordan does not follow up on that, does not bring that to the court's attention. It does not set off a bell in his mind that we need to immediately start investigating this man's mental state as it relates to mitigation in this case. That same month is when Mr. Daniels says, I won't wait time. He clearly has lost trust in trial counsel by that point. It's disintegrated. It's a relationship that is disintegrated and he's lost confidence in. By August, he's writing to Mr. Roth and stating, I believe that everything I tell this trial counsel is being repeated to the district attorney where Mr. Jordan had previously worked. He's telling the investigator, Bruce Cummings, whose declaration is before your honors, I believe that everything that I'm saying to this lawyer is being repeated to the district attorney. He has absolutely no faith that he can confide in Jordan. Jordan must have known that. His trial counsel, his trial investigator knew that. Jordan tells us in his declarations in his testimony, I was aware that this man believed I'd been appointed to obtain a death verdict. I was aware he had no confidence in me. What the district court found was that there was a lack of communication so profound that this attorney did not discover the basic information necessary to best defend this man at guilt and at mitigation. And trial counsel recognized that. Before the penalty phase, they came forward to the trial court and they said, you have to relieve Mr. Small. Please appoint Mr. Roth. It's necessary, in their words, for effective representation. The trial court refuses blindly. I submit in violation of the case law and says, for some reason, Roth wasn't appointed. I'm not going to go back into that. I think another point that the district court was exactly correct on was that this lack of communication, this irreconcilable conflict, was exacerbated and is very much intertwined with the ineffective representation. As I pointed out, Mr. Jordan was completely aware, in his words, that he did not have a functional or useful attorney-client relationship. He believed that Mr. Daniels believed he was there to obtain a death verdict. He never comes out and tells the trial court that. Mr. Daniels repeatedly brings to the trial court's attention, I don't trust this man. There's things that have occurred that caused me to distrust them as counsel. Mr. Jordan or Mr. Small, trial counsel, never come forward and say what is chronicled in all the Ninth Circuit case law, that he's not communicating with us. He's not talking to us. He believes we're here to work against him. They don't make the type of record the trial court needed to realize how irreconcilable this conflict was. Additionally, as the court has already pointed out, they, by their own statement, have not begun penalty phase preparation until after the guilt phase. That's why they're moving for a continuance. They tell the trial court this. And they indicate, and Mr. Jordan indicates in his testimony before the district court, that he was well on notice that there were serious mental state issues that needed to be investigated by way of mitigation. This man had a mental history going back to 1962. Contrary to the way counsel characterizes his state of mind, he had symptoms described in his prison records that are described as schizophrenic, out of touch with reality, not understanding what's going on. However you diagnose these, there's symptoms going back more than 20 years of mental state issues that are not investigated. There's a letter in the file, trial counsel's file, from Mr. Daniels to a Dr. Silver, one of the treating doctors, about his paraplegia, that physically I may have survived the shooting. Mentally, I'm destroyed. It's not followed up on. They send in Dr. Oliver to see him, and Dr. Oliver reports back, this man won't talk to me. He believes my conversations are being monitored. He's paranoid. He's suffering from paranoid ideation. They don't follow up on that. When they send in Dr. Banks, finally, at the last minute prior to penalty phase, he reports this man is in the 95th percentile of paranoia. Corroborates what Dr. Oliver says. Nothing is done to follow up on that. I concede that there were severe time pressures and money pressures. It's mind-boggling to me, I'm basically a trial lawyer, that money was not authorized in this case until after the death verdict occurred for expert examination. As a practical matter, how do you hire somebody to come in and see a client when the first question is, do you have money authorized for me to work? Do you have money that I will be paid with later? Trial counsel said, I wanted to follow up and investigate why this man wouldn't talk to me. I didn't know if there was a mental problem here, if it was simply distrust that had been engendered over what had happened in the case previously. I didn't know. I wanted to follow up on it. I had no funds until after the verdict of death had occurred. When mitigation was presented in the penalty phase, it was by way of Dr. Banks. That turned out to be more aggravating than mitigating. This was a man with no criminal experience. It was an unreasonable choice to select. He had distinctly done screening tests for his own testimony. He said, I need to follow up on my testing. I want to follow up on my testing. There were no funds. He did not have all the records I previously described to the court to have an accurate profile, pursuant to Carl B. Woodford, of this man, and formulate an accurate opinion as to his mental state. And most of all, Mr. Jordan himself says, I would never have presented this expert had I understood what he was going to say. I put him on the stand on the spur of the moment. I didn't understand that his testimony was going to be so damaging, that the test that he relied on was so unreliable. And it ends up being more aggravation evidence than mitigation, becoming a symposium on sociopathy rather than a discussion of mitigation in the case. So I think that the trial court, in conjunction with all the other errors in this case, correctly found that Mr. Daniels had not been provided a fair trial. One other point I want to make before I defer to my friend and my co-counsel, this didn't matter. We know it didn't matter from the record. The counsel for the government would have you believe none of this matters. This man didn't even need a trial. It was a done deal. Well, the jury struggled in this case. They came back with a question during deliberations. Can the law be changed so that Jackson Daniels will be given life without parole? And this court has noted, pursuant to Silva v. Woodford, that such a question bolsters a finding of prejudice. That a jury was struggling with a decision, pursuant to that case, and Viziotti v. Woodford indicates that the ineffectiveness of assistance to counsel, in spite of that, the jury was struggling. And it makes sense that they were. Counsel challenged us during briefing before the district court to get declarations from jurors to show that this was actively being discussed. We surprised two declarations to the district court of jurors 15 years after the verdict that they remembered the heated discussions over whether life without parole really meant that. This was a jury that was struggling with this decision. They wanted to understand what led up to this shooting in May of 1981. They wanted to understand this man in a wheelchair before them, before they decided whether to vote life or death in relationship to him. And with that, I'd ask to defer to my co-counsel, relating to the guilt-based issues. Let me just ask you one quick question, just a general question. We know that it happens in some criminal proceedings where the defendant doesn't talk to his lawyer, doesn't want to have anything to do with him. Say, particularly if they have a public defender, they say, I want a real lawyer. And, you know, there are times when this is done just to create issues on appeal that you're aware of. So how do we parse this out? Well, how do we know that in this case that Daniels wasn't just kind of trying to create a record? So he gets convicted and he's got another arrow in his quiver, so to speak. Well, I think there's several ways the court can know that's not true in this case. First of all, as I said, you have Mr. Daniels' letters concurrently with his relationship with Mr. Jordan, wherein you can see and track the developing distrust in his mind towards Jordan. He clearly was not just unreasonably unwilling to talk to Mr. Jordan or to trial counsel. He did talk to them, and he developed distrust based on those conversations. The argument is that paranoia got in the way. Paranoia got in the way, but also counsel wasn't preparing the case. I mean, what do you talk to a client about as a trial attorney unless you've gathered the records of his life, unless you know that months earlier he'd been arrested by the police and had filed a civil claim that he'd been assaulted and battered and that he had been left uncathetered in the county jail and say to him, did you believe you could not survive? And then the evidence of the mitigation thing. And none of that was within trial counsel's knowledge. He had none of those records within his possession. He had none of the records from Mr. Daniels' paralysis, Mr. Daniels' false arrest, the civil suit. He had no knowledge of that. What do you talk about to a client unless you show them I've been working the case, I know about your life, I've gathered the records since 1980 when you were paralyzed, I know what you've been going through. Let's talk about it. Mr. Jordan had none of that information. In fact, he cut off Dr. Banks' preparation. Dr. Banks said I had no information from 1980 on. All he had were prison records that he was able to obtain to formulate an opinion. And as I understand the case law too, when you evaluate a near-reconcilable conflict under the Ninth Circuit case law, you look to see was there cause for the distrust that had developed. And I think Mr. Daniels in the district court states there's ample cause to distrust who is going to be appointed just based on what had happened before Mr. Jordan was appointed. He'd had a public defender appointed for eight, nine months who was telling the court at the time of appointment, we have a conflict. Do you understand that we need to disclose to you why we have a conflict? We're being sued for ineffectiveness by this man at this time because one of our office members was negotiating with the district attorney's office while he was representing him on the bank robbery. And there's no inquiry, which is required under the case law. After that, Roth is removed when Daniels, the one person he trusts, with good reason, the one person he trusts is removed when he's saying, whatever you want him to establish by way of his testimony, I'll stipulate to. He's removed anyway. And by that point, a man's appointed who's been a district attorney all his career with another man who's been practicing a minimal period of time. And Mr. Daniels, in his state of mind with his background, feels that this is being done just to be sure he gets a death verdict. And I think he had ample reason to distrust, and then the man doesn't prepare the case in a way where Daniels says at least he's trying. You claim he trusted Roth, right? He had an abiding conviction. He never told Roth anything. Well, Roth... He never told Roth about a single defense he had. Well, see, I disagree strongly with that because all this information that I'm describing to the court, that the trial counsel did not have information about the 1981 arrest, the civil suit, the federal district court writ that was filed indicating that Daniels did not feel he could survive custody, that's all within Roth's possession. Those were all Roth's records on the civil case. Trial counsel never went to Roth and sat down and had an interview. Mr. Roth's declaration said they never came to me and said, why does he distrust us? What are the themes in mitigation that you think should be stressed in this case? Trial counsel, Mr. Small says, we never interviewed Roth. And what Jordan says, and the investigator corroborates, is that they had an abiding dislike of Roth. That Mr. Jordan, and he testified to this, said, keep your hands off the case. Let me see if I can do the case. And Bruce Cummings, the investigator, says they had a feeling that Roth, they resented Roth being requested by Mr. Daniels whenever he went to court. And I don't know what was going on in their minds that they had this belief they needed to prove that they had control of the case. But, you know, you see that happen with lawyers in cases. Lawyers have egos. All right. Thank you. I defer to my co-counsel relating to the guilt case. Thank you, Your Honor. Good morning, Your Honors. I'm John Phillips. Actually, I don't have very much to add, given the interaction between the Court and my co-counsel. I think that really the main point that I'd like to make to the Court is that in failing to provide guilt-based relief on the Sixth Amendment issues in this case, the district court was simply wrong. It was simply wrong about what escape hatch, as it were, there was for the Sixth Amendment violations that defined the irreconcilable conflict between Daniels and his counsel. Clearly, the Court found, I think, in six or seven places a lack of communication. And as Mr. Kaiserelis just said, the Court, taking into consideration this Court's prior rulings, was explaining that it understood in context why the lack of communication has developed, and it laid no blame at the feet of counsel or at Daniels' feet. In fact, its focus was more on the trial court. And I think the district court was concerned that the trial court was told at the time of the arraignment about Daniels' distrust of the public defender, the trust in Roth. And then you have, as Judge Ferguson was mentioning, there was the motion to continue that was predicated. This was prior to the guilt-based trial, incidentally. There was a motion to continue, Roth, in which, among other things, the defense investigator was saying, you know, we've only interviewed 10 of approximately 100 witnesses that we feel might be pertinent. And trial counsel are saying that they aren't prepared. Very soon thereafter, the trial court calendars a hearing, ostensibly to deal with the motion for a continuance. And at that point, Daniels announces that he's not going to waive time, in part because he, at that time, as Mr. Casarellas had explained, had decided that he felt that he couldn't trust Jordan. And so you see that prior to trial, that that communication problem had actually perfected itself. And the difficulty was that the trial court's view at that point was that Daniels had no right to insist on counsel of choice from its viewpoint. So its viewpoint was, look, from what I can see, you've got competent counsel. I'm not going to appoint Roth. I'm not going to inquire further. There were apparently some hearings that took place in the past that dealt with your counsel issues. Roth has been removed. We're moving forward. And so not only does the trial court decide that it's not going to give trial counsel further time, but at that point, at least focusing on the Sixth Amendment issues, this incidentally is just after this court decides the Hudson case, in which the court begins to define the kinds of inquiries it's expecting that state courts will engage in to actually allow Sixth Amendment rights to be vindicated. This is after the State Supreme Court of California in 1982, the year that Daniels is arraigned in this case, has decided one of its seminal cases on irreconcilable conflicts between a public defender or appointed counsel and an accused and the need to figure out how you work your way through a communication impasse. Essentially, the trial court has taken the viewpoint that once Roth has been removed and is not going to be reappointed, Daniels' complaints about counsel, about his lack of trust in counsel, are not going to be listened to. And unlike the Attorney General's viewpoint, I think ours is that while Daniels may not have been artful in his statement of his distrust in counsel, he did, in fact, point out at some points that he felt he was saddled with a co-counsel new to the case who'd never tried a homicide, who'd only been in practice for two and a half years, that he felt that counsel were not moving in certain directions that he had wanted them to move in. And then, of course, there are persistent complaints after the guilt phase, moving to the complaint made against counsel prior to the penalty phase, and then the statement that's made at the end of the case where Daniels characterizes his lawyers as warriors without a weapon. Now, did Judge Letts take the position that no matter what, this guy would have been found guilty? Did you have to have prejudice? Is that what Judge Letts was thinking? Your Honor, as far as one can tell from his order, I think you're right. He actually makes two points, as I understand them. One is he points out that if you look at a case like Mayfield, where you have overwhelming evidence of guilt, and clearly Judge Letts' viewpoint was that there was overwhelming evidence that Daniels was the perpetrator, then you can essentially wash away the presumed prejudice of a Sixth Amendment violation. The difficulty being, and perhaps we did this inartfully in our brief, is that, of course, you can be identified as the perpetrator in a murder case and still not be guilty of first-degree murder, particularly where there's a question about how impulsive or unthought-through a given act is. There are questions about the circumstances in a double murder of each of the individual killings. And then the second thing that Judge Letts mentions is that there's no showing that there were other lawyers available. And, in fact, there are some points in the record in which it's fairly clear that there are other lawyers available. For example, the former Riverside public defender, who's then in private practice, is consulted as independent counsel at one point during the course of the attempt to resolve the conflict. And in one of Daniels' letters that you have before you, and I realize this is not a matter of great substance, but it at least points to, I think, the incorrectness of Judge Letts' view, Daniels mentions that he has an interaction with his trial counsel, Jordan, in which Jordan is puzzling about how he got appointed since he was lower down on the list. Our problem was, frankly, that we inquired into the appointment list and that the appointment list from May of 1982 and from February of 1983 was not available. But clearly, with respect to that issue, I mean, counsel are found to deal with these cases, whether they are brought in from out of county or not. So the real question is whether Judge Letts is right, that this court has kind of a weight-of-the-evidence exception to the Brown v. Craven line of cases. And the reality, if you look at Brown v. Craven itself, is a case in which it's fairly clear that the focus, the attention in a murder case, is on Brown. He confesses to having been present in an apartment. It's his girlfriend who's the victim in the case. And this Court's position with respect to that is simply focusing in on the nature of the communication breakdown. It's very clear that there's a Sixth Amendment problem. So it's not at all clear, as far as we're concerned, that there's anything in the irreconcilable conflict cases that allows the escape hatch that the district court found. And our view is, again, very simple, that based on what this Court's view is that Judge Letts was clearly incorrect in his findings with respect to the basic fact that this is a Brown v. Craven situation and this man is entitled to a new guilt base. Your argument repeats constantly that Jordan was not a competent counsel because this is the first murder case that he had tried. Is that correct? That's correct. It's the first murder case. How many times must a lawyer lose a murder case before he becomes experienced? I read some place that only five percent of the murder cases are acquitted. So 95 percent of the lawyers who try murder cases, they lose them. How many times must you lose a murder case before you're experienced? You have to concede that Jordan was a highly experienced lawyer. He was. What makes a difference between a highly experienced lawyer and an inexperienced lawyer in a murder case? How do you get a lawyer in a murder case that hasn't tried a losing murder case? Well, I think you're right. I think people do lose murder cases. Can you name me a lawyer that you must know the bar? In California, there's an experienced lawyer who lost every murder case he tried. You know, I actually don't know lawyers who've lost every murder case he's tried. They don't talk about this. Well, that's possibly true. Although I think, as the Court knows, there's enough of a fraternity of the bar that we do share anecdotes about our losses. But I don't think it's – I think the problem, Your Honor, is in part that this is not only his first murder case defense as a defense lawyer. It's also his first capital case. And I think that part of our emphasis on his background and on appreciating the problem that was created was that he really didn't know how to go about dealing with the constellation of issues that were presented in this case. What did Jordan do wrong to cause the defendant not to like him? Well, Your Honor, if you – Because he was a former prosecutor, and he was an experienced trial lawyer, or because he was Scandinavian? Your Honor, any of those things – What's the biggest excuse? How do I like that lawyer because he's a Scandinavian? If you look – Do we feel sorry for him? If you look in his writings, Your Honor, he gives you a hint of some of that very early on. And again, his writings are dated so that you can almost see the number of times that Jordan has come in to see him by the time he's writing certain things to Roth. He's talking about the fact that his lawyer is talking about running an NGI defense, right? But at that point, this is prior to Oliver even seeing him. He's talking about the fact that the only way that you have out of this is, as Daniels understands it, is essentially to plead guilty. And so, as Mr. Cazzarella says, there's no indication in the context of the case that there is some kind of a familiarization process or an attempt to basically elicit the story. It appears from Daniels' understanding, again, that his view is this guy's background is a number of years with the DA's office, and here I am 30 days down the road, and this guy is basically telling me that, you know, I'd better fall on my sword and, you know, deal with the situation. And so that, I think, feeds into his distrust. It's not completely arbitrary. And I think that's part of what Judge Less finds. Your Honor, since the Court has no further questions, I will defer to the Attorney General. Is this, you know, we have court mediators in my circuit, and our court mediator, the person that runs the office, Mr. Lombardi, he has mediated, I think, three death penalty cases that have come to the circuit. And, you know, those cases were all dispositions were worked out. Have you ever thought about that? And he's experienced because he's mediated a death penalty case. Yeah. He's had success. I won't ask if he's Scandinavian, Your Honor. Your Honor, I would actually defer first to our colleague from the Attorney General's office, and at this point, I can tell you that Mr. Katsourelis and I have no instructions with respect to mediation or with respect to resolution of the case. Whether it's possible that that eventually might help is, I think, an open question. A lot depends on whatever ruling is handed down. We understand that. Thank you, Your Honor. Thank you. Thank you. There has been a lot of discussion concerning the irreconcilable differences between Jordan and Petitioner, and there was certainly a lack of communication. But I think it's important to bear in mind that there was no irreconcilable difference, as far as we know from the record at least, over what type of defense to use, either at the guilt phase or the penalty phase, or what type of witnesses. Jordan simply was not trusted by Petitioner, but it's not a situation as in other cases where there was a discrepancy over what type of defense, and I think that is key in this case. It's my understanding Mr. Jordan did have a prior homicide case as a prosecutor before. The record shows that he did ask Roth for help. He knew Roth personally. He testified at the hearing. It is true he did not receive all the funding he requested or all the time he wanted, but when we look at what happened, we see a vigorous defense at the guilt phase where he brings in a doctor to say that Daniels, after being shot, could not have operated a weapon, as the prosecutor theorized. He presented a scenario whereby other persons could have entered the house. In the penalty phase, despite his time constraints and funding constraints, he did present numerous witnesses to testify as to Petitioner's character. What happened here is there was simply overwhelming evidence of guilt. There was no basis to reduce this to a voluntary manslaughter somehow, and there was overwhelming evidence of aggravation. Repeat that last couple of sentences. There was no basis to reduce this case from murder to manslaughter under California law. You have to have self-defense or reasonable self-defense or kill in the heat of passion, which was not possible in this case. In the penalty phase, you had Daniels' lengthy history of violence, which included prior shootouts with the police. And I think most importantly of all, is since the time of this trial, when Petitioner's present counsel has had a lot of time to discover, allegedly, what Jordan should have discovered but didn't, there is really nothing of substance that would have made a difference in this case, given the evidence at both phases of the trial. Well, did Daniels' past history come in at the penalty phase? Oh, yes. All of it. His past criminal history was presented to the jury, yes. I'm talking about his being paraplegic and how that happened and what happened when he was brought in again, and the floor of the jail and the catheter came off and nobody helped him. Did all that come in? The evidence concerning the prior arrest and his being taken into custody while he was out on bail did not come before the jury, but obviously the jury saw the man and they knew he was a paraplegic. They could easily conclude what type of life he was living as a paraplegic. Well, did the jury know he was a paraplegic as a result of a gunshot? I don't know the answer to that. A spinal cord? I don't know the answer to that question, but the jury did know he was a paraplegic. If the jury did know about the prior shooting incident, I don't know if the evidence showed that his paraplegia resulted from that prior shooting incident. Unless the Court has any further questions, I am prepared to submit the matter. Do you have any comment on the possibility of mediation in this case with a 65-year-old paraplegic? I really don't think my office would be interested in some type of resolution. We have all the concerns about judicial resources being used up in retrial. We have all of the concerns, just humanitarian concerns about a paraplegic. And yet your office is not interested. I would have to speak with my supervisor. My sense is that there would not be an interest in trying to mediate this case. Let me say that. I think once law enforcement makes the decision to seek the death penalty, the law enforcement has studied the case and determined that the death penalty is the appropriate penalty. You're saying that because the police officers were killed here? That's a factor. I think the Petitioner's prior record is also a very important factor, too. As a general rule, I would doubt if my office would be interested in mediation in capital cases. As a general rule, I've never spoken with my supervisors. That's my personal feeling. Well, Mr. Lombardi has done three, and I suspect that probably all of them, or maybe two of them, were from California. Why don't you check around and let us know? Well, I can't ask. I just have a very strong feeling my office would not be interested in that type of procedure. Well, if you have mediation, there's one very important legal question that has to be resolved, and that is in the criminal case, when mediation is conducted, it's a defendant entitled to be present. We have a lot of mediation, of course, in civil cases. The clients are not there. It's just the lawyers. But in the civil case, it's the defendant entitled to be present. So if you're going to conduct mediation, make sure that that question is answered properly. Yes. All right. Thank you. All right. You got something else you want to say? Can I just get one point, if I may? I don't know how we divide the attention just across the field, but I would point out that two of the cases that come from this district, the U.S. v. Walker and Brown v. Craven, part of what's noted about the damage from the irreconcilable conflict is that the accused did not have a counsel with whom he had confidence in to confer and decide, how shall I defend myself? Should I testify? Should I not testify? And that is stressed in those case law as one of the damaging byproducts of there being a breakdown in the attorney-client relationship. In this case, again, I strongly would emphasize Mr. Jordan did not have in his records or his knowledge the essential story of mitigation and the guilt phase that was critical to talk to Mr. Daniels and present this case. He didn't understand how Mr. Daniels got paralyzed. He didn't understand about his rearrest, his mistreatment, and all the records that corroborated that and the witnesses that corroborated that. That was a massive omission. If Mr. Daniels had had confidence in his counsel, he did have the option, and this is for him to decide with counsel and effective counsel, should I testify and explain what happened here? This was a man who had substantial reason to believe, based on past mistreatment and feeling his life had been jeopardized, that that could happen again to him. And his explanation, obviously the shooting did not occur immediately upon the police coming to the house. He was easily located. They had entered the house. They were actually on the phone talking about bringing a cripple to jail when the shooting erupts. So I think that Mr. Daniels constitutionally had the right to confer with effective counsel, counsel he trusted, and make a decision about how should I defend myself. Manslaughters were not legally prohibited, depending on how he presented the case. So I just would ask the Court to understand that point in ruling on a cross appeal. Thank you. All right. You want to respond to that? I have to understate. There's a cross appeal. In response, I say there is simply no evidentiary basis for manslaughter. There's also been no showing, even as of this date, of what Daniels could have told any attorney that would have helped his position. When he had Roth, he didn't, according to the record, forward any information that would have been helpful. So he just had no helpful information to communicate. All right. Thank you.
judges: B. Fletcher, Pregerson, Ferguson